Good morning ladies and gentlemen. Can I have a seat please? Stockbridge 600 versus Industrious National Management. Just before we start, I just want to put something on the record. One of our panelists, Justice Martina Lankin, had a family medical emergency and won't be able to be here physically to participate in orals, but she will be listening to the tapes and she will be participating in the decision that's rendered in this case. I just wanted to make sure that everybody was aware of that. So the counselors are going to argue. Please step up to the podium. Please identify yourselves for the record and then what party you represent. David Perez, Perkins Cooley, representing Industrious and the tenant entity, the appellants in this matter. Okay. Good morning. Bill O'Neill from Winston & Strong on behalf of the police, Stockbridge. Okay, so 15 minutes apiece. Do you want to save some time for rebuttal? May I reserve five minutes? Sure. Yeah. Okay. Thank you. Okay. Thank you, Your Honors. Using a limited liability company to limit liability is neither wrong nor fraudulent. This is a case involving a relatively pedestrian and straightforward transaction involving two parties at a real estate deal. Both parties came to the table using limited liability companies. Stockbridge used this constellation of seven different limited liability companies to limit its liability in this case. Industrious used one limited liability company because co-working entities, like most real estate companies or like, frankly, banks, investment companies Did Industrious have other entities around the country or was it just here in Chicago, Michigan? Like many co-working spaces, whether it's WeWork or Industrious, they have locations throughout the country. And like most real estate companies, they set up a limited liability company, what we call a special purpose entity, location specific. So it would be 160 LaSalle tenant LLC. And on the other side, it would be 160 LaSalle landlord LLC. And that's how usually my real estate litigation matters go. And it becomes really confusing for the court because both parties effectively have the same name except for that last word. Who's he? It just goes landlordless tenant is what we're trying to do. I have a question. So your attorneys advised you to structure the member termination to minimize the risk of a veil-piercing claim. So does that suggest that a veil-piercing claim is valid? No. I'm glad you asked this question. It goes right to the core of the veil-piercing claim issue, which is when we're thinking about assets and we're thinking about shutting down an entity and you want to avoid risk and you want to avoid one risk is an alter ego claim. And so counsel at the time suggested correctly that, hey, there's some hygiene we ought to go through. And when I do CLEs and alter ego, I talk about hygiene. Keep separate bank accounts. Keep your financial separate. Have good books. Make sure your articles of incorporation are up to date. That's hygiene. One hygiene when it comes to coworking or real estate companies like Industrious would be, hey, you have 17 members here. You can't just e-mail all 17 and say, hey, good morning, it's Monday, we're moving you over here. That would be potentially, actually no court has actually said that, but could potentially expose you to fraudulent transfer. And I've said that in CLEs and this is what the counsel said in this case. It wasn't me, but I agree with that. So you go through hygiene and what they call sort of procedural details. They kind of want to yada, yada, yada over this, but it's really important. Rather than transferring, because verbs are important here, they didn't transfer anything. What they did was, hey, we're shutting down the entity. We're closing up shop in this location. We're going to terminate these agreements just like you would. You've got a cleaning service, they're going to terminate that contract because you're closing up shop. You've got a contract with a city for utilities or a flight, you're going to terminate those. So the members couldn't just be moving across the street or moving down the street. So why all this cloak and dagger type of scenario happening at Jackson when stuff hit the fan, so to speak? Let me just finish that answer because it actually dovetails with the question you just said. It's both legally and practically important that they terminated those agreements, returned the security deposits, and now these are free agents. Now you can go, Justice Walker, wherever you want to go. We'd love for you to stay with us, and we have locations around here, but you can sign up wherever you want to go. And 87% of them signed up elsewhere. They left. I have a question. Oh, go ahead. I do want to make sure I answer your cloak and dagger question. So did everybody get their security deposits whether they went with industrious or not? 100% of them were terminated, and 100% of their security deposits were refunded. At that point, they're free agents. We would love for you to stay, and here are other locations, but you'll have to sign a new agreement altogether. New agreement and new security deposit. New security deposit altogether. And this is what I go back to with my CLEs on alter ego. That's hygiene. And they want to yada, yada, yada, but don't pay attention. That's really, really important because it shows you're not transferring anything. You terminated it. Now, let's talk about transfer for a moment because transfer in the classical sense, in the real sense, is you talk about capital. You talk about money. I have $300,000 sitting in Chase, and I'm going to transfer it from this LLC to my Citibank account. Well, money, it turns out money does what I tell it to do. It's an asset. I tell money to go there. It goes there. Members don't do that. Now, if I transferred money and I lost 90% of it in the transfer, I'm awfully bad at transferring money. And so that's why the practical effect of those just confirms it wasn't a transfer either under the Uniform Fraudulent Transfer Act or under alter ego, which is they're blending them together in that sense. Go ahead. I don't know that you've really talked about the cloak and dagger yet. I do want to get to that. So was the issue of your members not being considered assets raised at any point during trial? And how do you respond to Stockbridge's assertion of waiver? Yeah, it's a great question. Both sides fought over that. It's right there in our brief that these aren't assets. We terminated them, and it actually is sort of a branch of two arguments, which is members aren't assets because we just don't own them like I would going back to the classical sense of property. So it was absolutely raised below. In fact, you can see in their briefing, they respond to it in their briefing below. So either they're responding to an argument that we never made, which would be acrobatically odd, or we made it. But regardless, it's right there. Even setting aside waiver on all these assets, it would be really bad precedent to start saying members, individual companies on these facts are assets. And you didn't have any accounts receivable. Zero. Because of the termination of the current tax. Bingo. And, of course, you know, as a former CPA, I kind of have a pretty good understanding of what an asset usually is. You have a better understanding than I do, so I hope my money example made sense to you. But, you know, so far it would be the same thing. You can pick up a cell phone. It does what you tell it to do. Members did it. Eighty-seven percent of them left. Look, I want to address your question head on, the cloak and dagger. And I don't mean to be too colloquial here or blunt. It doesn't matter. Post-breach behavior, you know, when we're talking about shutting down locations, whether we're McDonald's or Starbucks or WeWork, we're looking at our portfolio. We have 100 locations. And we want to think through, am I going to close ADF or, you know, I need to think through that. And I need to think through and make a business decision without necessarily involving every single landlord or counterparty who I'm about to breach. I'm about to breach an agreement. And so we sent in movers, and they decided to not say, to survey. Really, they were surveying the space to say, okay, that's going to be a big table, so we're going to need a truck. Well, there was some prior communications. Sorry to interrupt you, but there was some prior communications in terms of individuals that were associated with Jackson that started this conversation about, you know, we've got to have them come in as insurance agents or whatever. They decided on their own. So where is this coming from? Who is directing them? Who is making them or who precipitated all this communication? Let's take a step back. In April, the breach had already occurred, and so rent had already stopped paying. So this is now post-breach behavior, and we've never seen a case that suggests you can use post-breach behavior to turn around and pierce the corporate veil. But really what it was about is we haven't told the members yet. This is now really just between us and landlord. The members are blissfully ignorant of what's going on over here, right, the subtenants, the members. What we wanted to do was go in there and not alarm them. Hey, we might be closing shop. Hey, this, you know, this might go belly up. And so really the movers were there not just to not ruin or alarm the members, but, yeah, I've been in real estate litigation too many times to count throughout this country. I'm lead outside counsel where we work. When landlords have locked us out, locked out, once they get a sniff that we might be breaching the lease or backing out, they will literally shut off the freight elevator. Now, to access the freight elevator, to move, you actually need landlord's key. And I actually in Chicago actually, now I tested my memory, four different lockout scenarios where we would have to run to court or threaten to run to court to say, hey, even if we're about to breach, you can't set up our furniture hostage. Maybe retaining the members' furniture perhaps or other property as well as the breaching entity. Potentially. It just becomes a hostage situation where, hey, we can have a good faith dispute over the breach, but you can't keep our artwork. You can't prevent us from using, you know, paragraph 37 of the freight elevator access. But regardless, whether we dress up like the hand burglar or whether we dress up like movers, it's not a reason to pierce the corporate veil because there's no authority for the notion that the breaching party has to give you all the cards on the table, what it's thinking, what it's thinking. You will admit that it looks a little suspicious. So let me push back on that. Again, I'm only because I'm pulling on my experience. I was about to say pulling on my hair. I don't have hair to pull. Pulling on my experience on lockouts. It's pretty routine not to let landlord know what you're considering in a survey scenario. I mean, because you play it out. Hey, landlord, we'd like to be there Tuesday at 3 o'clock to survey a potential move because we're thinking of shutting down the location. Now you're getting fireworks. We're not even getting in there until for two weeks. Now outside counsel is going to be involved. But I agree with you. Optically, it's not great. I don't run the business, but I understand just given the legal scars I've had, I get why they wouldn't want to announce that. Whether they then say there's someone else wasn't their call, but the record's pretty clear. Industrious didn't tell them to dress up like movers, and they didn't. Industrious just told them, be discreet. So wait a minute. Were we talking about Industrious National or were we talking about Industrious Jackson? I don't want the record to get confused here. Yeah, no, and that's fair enough. When I say Industrious, I mean the national company, and tenant, I mean the subsidiary. Now, the subsidiary is a single-member LLC. So Industrious was the only member, and that's how all these real estate companies are operating. In fact, the constellation of Stockbridge's LLCs are all single-member LLCs. No employee, no office space. Yeah, we understood, I think, that they have the same sort of corporate structure that they blamed you for. You know, the employees and officers are all from the parent and not from the subsidiary LLC, if you want to call it that. They weren't having seven board meetings a month, you know, to talk about this building. You know, and it goes really to the heart of the alter ego analysis, because a party that comes in with the same conduct as the other cannot then say, hey, that's a foul. Please use your equitable powers inherent to a judge to unwind this deal. It goes to the unjust loss. You knew exactly what you were getting yourself into, and frankly, we did too. The roof collapses, or I usually get a plaintiff in landlord litigation. So I'm suing the landlord, and guess what? I'm suing the LLC. I'm not suing J.P. Morgan. I'm not suing Stockbridge parent. I'm suing, you know, one- The one with whom you contracted. That's it. They're suggesting, though, that you sort of pulled the wool over their eyes with respect to- Let's talk about that. Who you were contracting, who was actually contracting with them. Can we talk about that? This is kind of an astounding argument. I don't want an astounding argument, and it's really not an argument. It's just a suggestion, because there's no evidence in the record, and they have the burden of proof to say that we misled them. The person who signed the lease never testified. Mr. Hunter. Mr. Hunter. So the only evidence is hearsay evidence of someone who says, I think he might have been confused. Now, let's stipulate he was confused, just for the sake of arguments. Let's say Mr. Hunter did not know. That is their fault, not ours. They set up a site-specific LLC. We set up a site-specific LLC. And for them to sign a deal with, you know, Justice Walker LLC and not know that that's an LLC rather than a parent company or- That is on them. You know, there are three deals. So the lease was kind of specific about that, though, wasn't it? Sorry. The lease. It was site-specific in terms of who they were entering into the contract with? Not only that. Industrious' business model, I mean, you could Google this. It's all site-specific LLCs, but as a real estate company that uses site-specific LLCs, it is not credible for them to argue, without evidence, by the way, because there's still no evidence in the record, that we were bamboozled. Now, here's what would be evidence, which is not. You will be signing with the parent co. There will be no subsidiary LLC involved. If we had that, and then we kind of snuck in an LLC, maybe. You still signed the deal. Here, typically, real estate transactions go, you sign a guarantee, a parent guarantee. You said that occurs in about 30% of your contracts? Yeah, and in WeWork's case, it's even more. Yeah. And so you have an oral letter of credit. So you have this, what we call, a security package in the real estate world. Because you know you're actually signing with an LLC, so if everything falls apart, we don't really have recourse, right? So I want a little bit of insurance. I want a $5 million guarantee, or I want the equivalent of six months' rent in a letter of credit that I can draw on to Goldman Sachs, and you don't get to stop me because it's a letter of credit. That's a security guarantee. And there was none here from an industrious national? And the reason for that is you then command higher rent. If you get a guarantee from me, I'm your tenant, let's say, all right, fine, I'll give you a $1 million guarantee, but then the accountants, CPAs, will figure out lower rent as a result. Because you get your insurance, but I get lower rent. You had no insurance, so you pay higher rent, right? And so that's just a deal. And what they want to do is unwind that deal because it just turns out the economic possibility of collapse, in fact, occurred. And so you're the deep pocket, so why not come in? Right, exactly, and that's the point of the first two L's. Fortunately, the first two L's make clear that we've limited our liability, just in the way their deeper pockets, because stock brooches pay multiple of a multiple of industrious, limited their liability. And so neither side can ignore those first two L's and hold the managers or the owners responsible, having signed a deal that is so transparent and above board. They want you to come in now and scratch out the tenant party, write in a new tenant party, add in a guarantee or a letter of credit, and rewrite the entire agreement because a couple guys showed up dressed like movers. So on the issue of limited liability, did the members continue to pay their monthly fees from most of April to October? I believe so. What happened to those funds? Those funds presumably were just used in the industrious Jackson facility, either to pay the lights or to go to Stockbridge. Some of it did go to Stockbridge, actually. Some of it went in the form of $14,000 to Stockbridge. I don't have the exact numbers, but there was no evidence at trial or on the record before you that there was this lump sum capital amount, just to use a round number, $100,000, that was then fraudulently transferred out of Citibank here account to Citibank here account. And that would be a really clean fraudulent transfer claim. But Stockbridge was still paying on the mortgage bill, right? That I don't know. I don't have evidence that Stockbridge was paying their mortgage. I assume so, and I'm happy to stipulate that they were paying their mortgage. But again, that's the risk landlords take, that a tenant might stop paying rent, and your relationship with your bank mortgage is completely different. Those are two different privity relationships. But there were no funds transferred from the, let's call it a sub, to the parent. During this period of time where the tenant was already in breach. $20,000 was transferred long before that, and that was in your, I guess, contention that it was way overshadowed by the $917,000 you had invested in the property. First off, your command of numbers is sort of astounding. Yes, that is correct. Over the years, over $900,000 was capitalized into, including $400,000 right before the pandemic, around January 2020. In those years, only $20,000 went up. Now, in every single alter ego case where I've been in, the plaintiff or the tenant, I've never seen a one-sided flow of capital like this. Never. It's always been the other way. And that's really important when it comes to misusing the corporate form or making a jam. Because the reason that Justice Reyes LLC collapsed is we stripped you of all your capital, and you couldn't pay your bills. And look at the bank trail. And that's what your expert testified to. Did the other side have an expert? I think they did, yes. And that expert testified? Yes, I think both experts testified. But counsel, no, for sure, I'm a pallet counsel. And both sides had experts. Our expert made very clear that this is how LLCs just work. But the flow of money, to your question directly on the factual matter, no, none of that money flowed up to the parent co, it's called, Industrious Parent Co. But it also didn't go towards stockbridge. It did not. It did not. And my understanding is you're saying that the funds, if any of the funds were received from April to October, they went to pay off debts. Yes. All right. Was it stockbridge or not? It was not the creditors, just like anybody else. It's their responsibility as the carrying the burden of proof of trial to kind of stitch together whether there were certain monies that should have gone to them over, say, the city lights bills or the utilities or the cleaning service. But regardless, only $20,000 went up. 900-plus went down. And that ratio not only confirms it was capitalized, but not that this necessarily matters, but it's important, far more important optically than people dressed up like mooters. It's important because it shows just how bad this economic decision in reality was and why the business decision to close down made sense. This company, this entity had already drained about a million dollars from the national parent co. We're talking about jets, right? At best it was breaking even. At best it was breaking even. You're already down a million dollars. So at best you're breaking even. We're never going to see that million. So extrapolating when COVID hit, and I think, hey, we can take judicial notice that COVID did not do wonders for the commercial office space industry, it was no longer tenable. Okay. Again, on the issue of limiting liabilities here, when Jackson, that's the way I refer to it, it's Industrious Jackson, initially defaulted in April. How many members were at the 600 West Jackson location? About 40. About 40. Yeah. And how many were mended up in other industrious locations? Six. Six. Yeah. So it was 87% decided either to go with a competitor, go home. We don't know. They could have chosen, I mean, it was COVID. Everyone was doing their own thing. Six of the four, I think it's actually 45, six of the 45 chose another industrious location. All 45 contracts were terminated. All 45 security deposits were returned. Six decided, you know what, we'll stay in this ecosystem. Only 13%, which shows we had to compete for their business. But here's another fact that they glossed over, which is really important, because it goes to unjust loss and limiting liability. Really, a version of limiting liability is mitigating your damages. We told them, hey, here are the members. Do you want them? Do you want them to stay? We're a co-working space, so there are things you're going to have to do, like provide coffee and a doorman and stuff. We're not just turnkey, forget it. The whole point of co-working is we take care of all the back office stuff. Do you want to do that? No, we're not in the co-working space. So at that point, because this goes to fraudulent transfer, at that point Stockbridge had closed the door on any possibility that these members would stay, because they agreed. It's right there on page one of their brief and page 30. You had every right to shut down the facility. You had every right to make the business decision to shut down Industrious Jackson. Having conceded, we have every right to shut them down, and you don't want the members. The only possibility is terminating the contracts, and then they go elsewhere. So to play that differently, are we going to force them to stay? I mean, they could have gotten another co-working space. This is where I think their arguments start to break down, just as the practical reality, and none of this rises to the level of an alter ego claim, because if it does, then a lot more routine breach of contract cases are coming through that door, claiming unjust loss and piercing the corporate veil. This is one of the more pedestrian breach of contract cases you're going to see, but if this rises to the level of piercing the corporate veil, I think those first two L's are going to be deleted. All right. We've gone a little bit over your time. Sure. No more questions. Okay. So if you want to sum up, you still have time for rebuttal, but if you want to. My sum up is this, is they're just, in this case, in a normal breach of contract case, where you don't have an unjust loss or fraud or fraud adjacent behavior, you cannot pierce the corporate veil and hold a, you know, and override two default rules. The first default rule being a non-party to an agreement is not liable for a party's breach. That's a default rule. And the other default rule is that a member or an owner of an organization is not liable for that LLC's conduct. That's the point of an LLC. And it's really extraordinary to override both those default rules. All right. And one last question. I understand both parties agree that, you know, we should consider Michigan liar. Right. And so in the alter ego context, you start with the law where the LLC was incorporated, was organized. So in this case, it's Michigan. Okay. Thank you.  Just in fairness, we gave him a little more time, so we're going to extend the same courtesy to you guys. Thank you. Thank you very much. You know, hearing the arguments from my friend on the other side of the aisle, you would believe this is a garden-variety breach of contract case. There's nothing to see here. This would have far-reaching implications into the real estate community if we upheld the trial court's verdict. Nothing could be further from the truth. This was a very highly fact-specific dispute stemming from some deeply troubling corporate misbehavior. And Industrious, they had a fulsome opportunity to present evidence, witnesses, legal arguments. This case was tried as a bench trial before the Honorable Mary Colleen Roberts. She did not exclude a single document. She did not exclude any evidence at trial. She did not restrain Industrious in any way from making any argument they wished to make. At the conclusion of the trial, there was post-trial briefing, and then she issued a very detailed and thorough written opinion. Unhappy with that opinion, Industrious is here seeking a second chance with new counsel, and in so doing is presenting a host of arguments. Well, what argument or evidence do you contend they should have put on at trial? Well, for example? Post-trial litigation. So, for example, they make the argument now that the members aren't assets. That's an argument they had a fulsome opportunity to make at trial. They never made that argument. They waived that argument. They make the argument now that Judge Roberts incorrectly calculated the damages for the fraudulent transfer claim. That argument they had a fulsome opportunity to make below. They could have had an expert testify to damages. They say the $700,000 calculation is incorrect. None of those arguments were raised below. And let's get back to that first one. How can members be assets when they're not properly owned by Industrious Jackson, and how can membership agreements be assets since they were terminated? Great question. So, first let me say I wouldn't devote any of my remarks to you today to the fraudulent transfer claim. I'm surprised it's their lead argument in the brief. It was an alternative theory of recovery that we advanced solely if the bail precinct and breach of contract claim failed. And so if you find there was sufficient evidence, really if there was any evidence, to support Judge Roberts' conclusion on bail precinct, you don't have to reach the fraudulent transfer claim at all. It was a subservient alternative cause of action. So that would be point one. The second point about the members being assets is their own executives admitted this. And so I examined their chief legal officer, Clem Turner, an incredibly accomplished lawyer, Princeton undergrad, Georgetown Law School. I asked him on the witness stand, and at the record at page 72, he said, Industrious Jackson's members were their only other assets besides the lease. And then at page 75 in the record, Mr. Turner testified that the Jackson members are really important to their business because, quote, they're some of the only assets it had. And so their chief legal officer admitted in the trial court that these members were the assets of the organization. The contracts for the members, which produced a future stream of revenue, right, when our sophisticated clients buy businesses, they pay a multiple of the earnings power of the business. The earnings power of this business was the membership contracts that were in place that produced revenue into the future. And we know- because didn't the members' agreements indicate that they could terminate their membership within, what, 30 or 60 days' notice? Sixty days. So he speculated to say that these things that, you know, these aren't accounts receivable because they haven't been earned yet. So we can't say it's an asset based on it being an accounts receivable. So it's sort of executory. It's something that may or may not occur in the future. So wouldn't that be speculative, Mr. O'Neill? So I don't believe it's speculative. It is executory. And there is a termination right at 60 days. So it's guaranteed revenue for 60 days for all the members. So that's as good as an accounts receivable, at least 60 days from all the members that were transferred. And then what we know from the record is the members didn't transfer. It's like we have real world experience that industrious earned hundreds of thousands of dollars in future revenue from these very same members. National, not accident. The national organization, which they reported all their revenue as all the revenue from all of these special purpose entities were reported as revenue of industrious national management company. And they presented to all of their investors consolidated rolled up financial statements that included the revenue from every one of these SPs. But wouldn't that be just ordinary business practice for the flow of consolidated financial statements to include in the parents all of the subs? That's how they presented it, yes. But that would be true in every business situation, would it not? In a parent-sub relationship? No. I mean Stockbridge presumably presents a consolidated financial statement, correct? Some do and some don't. That's, I think, the choice of the parent as to how they want to present the financials, whether it's on a consolidated basis or a separate basis. I think the point is they presented to you today, oh, this was just a failing business. This was just a failing business and it's no one's fault that it failed. But they gloss over the really disturbing actions starting at the execution of the lease and running through the termination of the lease. And then they also gloss over the fact that two weeks after they terminated and they made the decision to close this location down, they opened a brand new industrious facility two minutes away that was four times larger in the Sears Tower. And that's where they tried to move these members. So this was a very well-thought-out, intentional plan to siphon away the members from the SP without paying any consideration for the members. You asked about the legal advice that was provided. The legal advice that was provided was you should pay fair market value for the contracts that you're signing over. That's the legal advice that was provided. That's what I believe should have happened. And that's the legal advice that was ignored. And they paid nothing in consideration for the members that they moved. Well, I have a question because you say they went into a larger facility, but I posed the question to counsel about how many members were at the 600 West Jackson location at the time of the default. And he said there was about 45. And then six out of the 45 went to industrious. So why did they need, I mean, for just six, why would they need a larger facility in terms of your argument that they went somewhere else and it was a larger place and they weren't trying to avoid liability with the 600 West Jackson? So Mr. Perez was mistaken about the record on the number of moved. It was at least 12 of the tenants who I think the number was closer to 30 total and about 12 of them moved to other industrious locations subsequent to the termination of the lease. But, you know, they opened up a larger location because they deemed that that was better for their business strategy. If you look at the record documents, they called this project, they called it Project Blue internally. And then when they wrote a memo internally about what they were doing, they said the number one priority of this was to shed locations they didn't like while retaining the membership base. And so it was the plan was to dispose of sub-performing locations while preserving the membership base and moving them to other locations, all the while paying no consideration to the subsidiary. They left the subsidiary without assets to satisfy the creditor here. So everyone paid their bills in this tripartite ecosystem except industrious. So Stockbridge paid its mortgage. The industrious members paid industrious. Industrious didn't pay Stockbridge and took the only thing that could make, the only assets it had which were contracts that were generating revenue to the future and moved them to these other special purpose vehicles and earned hundreds of thousands of dollars from that. And so Mr. Perez is right about one thing, which is it's okay to have a limited liability corporation and we can in Illinois respect limited liability if the behavior is worthy of the distinction. And here the behavior was unquestionably not worthy of being respected by this court. And so Judge Roberts, she weighed all this evidence and she heard this trial. And there were five things, if I may, that supported her decision that this was a case where there was evidence to support a veiled piercing determination. The first thing was there was a false statement made at the inception of the lease. And so industrious lied to Stockbridge that each of its units was cash flow positive at the inception of this lease. Well, they argue that you're taking it out of context. But the very first sentence in that two sentence paragraph talks about the mature, not the immature. So, you know, I don't think that's your strongest argument. So can I, I'm so glad you raised that. Sure. Because here's why I find that so remarkable. I deposed the president, the founder of Industrious in the case, Justin Stewart. At his deposition I said, quote, is it not accurate to say that each unit was cash flow positive? It is not accurate to say that each unit was cash flow positive, correct? He said, no, that was not accurate. Then I cross-examined Mr. Stewart at trial. At trial I asked him this question. The last sentence regarding each unit being cash flow positive was not a truthful statement, correct, sir? His answer, that is correct. This case has been pending for four and a half years. Not once in those four and a half years until they got to this appellate court did Industrious ever make the argument that that statement was not accurate or truthful. It was for the first time on appeal after their senior most executive admitted at his deposition, admitted at trial, that it was false. And was that in the context of all of their operations? It wasn't, it had nothing to do with this particular location, correct? So what they were saying was, assign this lease to us, Industrious, because here's our financial balance sheet and all of our locations are running at a cash flow positive basis. So this is really safe, secure credit. That's what they said. And there is abundant evidence in the record of the negotiations of the lease that led up to this. And at no point in those negotiations until the very final document was signed did they ever tell Stockbridge that the tenant was going to be anything other than Stockbridge National Management Company. They led Stockbridge to believe they were signing a lease. You mean Industrious? I misspoke, you're correct. They led Stockbridge to believe they were signing a lease with Industrious. The entire time of those negotiations they sent the financial statements for the parent company. Well, they didn't ask you if there were any financial statements yet for the tenant. Because the lease hasn't even been signed yet, right? There's no assignment of the lease yet. It was an operating business that they inherited. It was an operating co-working business that they inherited by acquisition.  Assembled, exactly, you're correct. So they could have provided the financial performance of that location prior to, because it was an operating co-working location. It had financial statements. No one of the people didn't ask for that? They didn't ask for that because they believed they were getting, they were signing a lease with Industrious National Management Company. It seems like that wouldn't work in this industry. That that belief system wouldn't be one that they would know better about. You know what I'm saying? Because like Mr. Perez was talking about, we work in all these other office sharing spaces and that Stockbridge would know better than that. So that it was, that you were dealing with the parent and not with the location specific site. And that's Mr. Perez's argument to you. And that's the argument they tried to make in the trial court. And Judge Roberts heard all that testimony. And she issued an opinion. She weighed the evidence. And she issued an opinion and said they lied to Stockbridge at the inception of this lease. And there is evidence. And you could say, you know what, if it was me, I'm not sure I find the evidence as powerful as Judge Roberts did. But there was evidence. And we're sitting here on a manifest way of the evidence standard. And I don't think it is for us at this point in the proceedings to say, you know, I might have accorded that evidence a slightly different weight than Judge Roberts did. Or I might have accorded it a slightly different weight than Mr. Perez would like you to have accorded. I think what this court's prior precedent says is if there is evidence, we have to respect the trial court's decision on this issue. And she did weigh that evidence, Your Honor. So how specifically did they mislead Stockbridge when they're a subsidiary? And you're saying that you didn't realize, or I'm sorry, your client didn't realize that they were dealing with a subsidiary. But they were, they thought they were actually dealing with the main corporation. So what specifically did, because when I looked at the lease, it seems like it's apparent that they're not the major corporation here. They're a subsidiary, at least the way I read it. So the entire course of negotiations, which is in the record, is how we got to the lease. All those would suggest the tenant is going to be Industrious National. There's never a suggestion ever made by anyone that the tenant is going to be anything other than Industrious Parent. And then when the lease gets signed, there's a bracketed blank to fill in the name. They put in the name of this S.P.E. and the lease got signed. Right. But you didn't refuse to sign. Your client didn't refuse to sign it. You're correct, Your Honor. Because it was open and obvious. It was on the face of the lease, Your Honor. Yeah. Yes. So we got two special purpose entities dealing with each other. And so the other one couldn't recognize that the other one was a special purpose entity? And Mr. Kress made much of the fact that there's special purpose entities on both sides. Right. The difference is one acted ethically, honestly, and didn't use the limited liability vehicle to commit a wrong or injustice on the other. And one did. And so there's no suggestion in the record that Stockbridge used its special purpose entity to commit a wrong or defraud anyone. But there's abundant evidence that Industrious did that. And that's what makes this case different than the garden variety, two limited liability companies. The business didn't work and it failed and no one, we should just say, they're out the money. They don't have to pay the millions of dollars left. That's what makes this case different. And that is a very intricate, factual record that was well-developed. And there's a lot of evidence that was in the record, right? It's undisputed in Justice Jackson. Speaking of evidence, and I don't mean to interrupt, please, what about Professor Henderson's report and testimony? Professor Henderson's report is totally unremarkable. He offered conclusions of law, which it's unclear the trial court accorded any weight to, given obviously Judge Roberts was very capable of interpreting the law herself. But Professor Henderson, if you look at my cross-examination of him, Your Honor, he was not given any of the evidence. He rendered his opinion without being provided a single base stamp document producing discovery. So he admitted in his testimony he offered his opinion from an ivory tower where those were his words. And he didn't see any of the evidence of what Industrious Jackson was doing, how they were setting up this entity, the fact that they had no board meetings, the fact that they exercised complete dominion and control. He didn't see these. We spent a lot of time at trial showing these Slack messages, which are internal chat messages that Industrious used, which show, I think, some of the cloaking dagger things, to use Your Honor's word. Professor Henderson wasn't given any access to the evidentiary record. He just issued an opinion as to what he thinks their producing law in Illinois should be. Is it Michigan law or Illinois law? Well, I think he issued his opinion. Michigan law is the law that applies, and the parties agree to that. Professor Henderson, I think, would say he's an expert in Illinois law, but I'm not sure it matters. I didn't see anything in the briefs, at least, about your testifying expert. We didn't have one. You didn't have one. No, no, we didn't have one. But Professor Henderson, I know you say that he didn't really look at the facts. He was really like a legal expert, maybe to enlighten the court on what the law requires with respect to piercing the corporate bail. But he talked about how you don't see money flowing down to substantiate an abuse of the corporate structure. You always would have to see the money going up. And I think that that's a pretty compelling argument. So what's your response and contention to that argument? I'm glad you asked it because it's not correct to say the money floated one direction. The money flowed post-termination of this. So $20,000 flowed up prior to shutting it down. $700,000 flowed up after termination in the form of dues earned from the members that were Industrious Jackson members, dues that could have been used to satisfy the obligations of a landlord of Stockbridge. So they saved $900,000. I think the record actually shows it was $450,000 they invested in this entity. But regardless of what it is, they got back $700,000 of value in membership dues from the tenants at the location that they left the landlord holding the bag for. There was no money that went up prior to termination of the contracts with the members, right? $20,000. Only $20,000 before the termination of the contracts. Correct. So you're talking about the post-termination money that you say because they transferred their only asset. That's really the crux of your argument. Is that correct? That's the crux of my argument with the fraudulent transfer claim, Your Honor. Yeah. And we terminated the contracts. That is window dressing. Because if you look at the timing of when their communications to their members, they solicited all their members to move to other locations. They offered free rent. They offered to move them for free. All that happened before the termination. So when the members said, I'll go across. Didn't it happen in October? It did happen in October. Okay. They terminated, what, October 31? No, they sent out a notice to their members. September 28? No, it was in October. It was an email. You're correct, Your Honor. The actual termination of the contracts, I believe, happened in October. But it was before October that they made a kind of a guerrilla marketing campaign to convince the members to transfer. And by the way, transfer is not my word. They used the word transfer internally when they communicated at Industrious National Management Company on their stock matches. They called it transfer. When they communicated to the members, they called it transfer. When they went to seek advice from the lawyers externally that they didn't follow, they called it transfer. So everyone called it transfer. In the appellate court saying, we just terminated and we signed new agreements. But the record below, in every party they were dealing with it, they called it a transfer. And now they say, well, it wasn't a transfer. We terminated and then we signed a new agreement. That is a, respectfully, that's a bit of a shell game in red hair. Why didn't the Stockbridge seek or secure a guarantee from Industrious National since it was fairly common in this industry? So it didn't believe it needed one, Your Honor. It didn't believe it needed a guarantee. And I think you're entitled to contract with a counterparty and believe they're going to deal with you honestly, ethically, and fairly, and that they're not going to engage in the cloak and dagger maneuvers that happened here. And so, of course, with the benefit of hindsight, we can sit here four and a half years later today and say, well, they should have gotten a parent guarantee. They didn't realize that they were going to go to the lengths they went to to manipulate, to, you know, dress up movers, to tell them that lie about who they were going to be, to engage in a fake negotiation about an extension for the lease. Stockbridge offered them what they internally said. They have locations all over the country. They said our proposal to them allowed them to break even and stay in business during the heart of the pandemic. In response to what they internally said was the most generous proposal made to them by any landlord in the country. They said, let's make them a BS proposal. They will never accept. That's what they said internally. And why did they do it? They did it for the reason Mr. Perez explained to you, which is we've got to keep from being locked out. We can't have that freight elevator turned off because we've got to get these tenants out of here and into our other locations. So I don't believe when Stockbridge signed this lease, it anticipated that a company of national repute would engage in the behavior that was engaged in here with them. And if they knew that in advance, of course, Your Honor, they would have said, I need it. After this case, maybe every landlord in the country will ask for a parent guarantee from investors. But at the time, we didn't know that, Your Honor. I'm sorry. Just one question I wanted to ask about. Not knowing, but in the record, I believe there was some evidence indicating that one of your representatives in 2018 had written a memo indicating that Industrious Jackson was actually an S&E. They were not the national. So if you got a memo in 2018, how can you say then in 2020 that, oh, well, you know what, we were duped at the beginning? Your Honor, I'm not familiar with the memo that you're referring to. I mean, I think, as you said before, the lease says the entity that was signing up for, that we were signing up to do business with. It was based on an assignment agreement, if that helps. This was an assignment from Assemble, which was the prior co-working tenant in the space, to Industrious, which acquired Assemble. So when they did that acquisition, there was an assignment of the existing co-working space to a new owner, which was Industrious in that space. Did Assemble have like a parent sub? I'm using that colloquially because I know these are LLCs. Right. But did it have the same situation where it was like Assemble parent and then Assemble LLC at Jackson? It's Assembled West Jackson. Your Honor, I don't recall. I'm not sure it was in the, I'm not sure that part of the record was developed. And I just have one final question. Sure. That is, how do you respond to Mr. Perez's contention that you're asking the court really to ignore the first two L's in LLC? Yes, Your Honor. I mean, I knew it was open and obvious you were entering a contract with an LLC, that limited liability corporation, and they made all these business decisions that they thought were, that the parent thought was in the best interest of the company. So how do you sort of respond to that contention? Your Honor, my response to that contention is Illinois law and Michigan law and the law of every other state in this country is that we will respect limited liability if corporate formalities are followed and people do not engage in fraud and do not use entities to commit wrongs. And in this case, there is abundant evidence that the trial court occurred in a way and supports a determination that this entity was used to commit a wrong on my client. And that decision by Judge Roberts should be accorded substantial weight and deference because it was based on evidence. And so we shouldn't ignore limited liability in every case, Your Honor, but on the unique factual record developed in this case, there is evidence to support it. So you're kind of going back to our standard on review. That's really your underlying strong argument. I believe so. You shouldn't disturb this on review. So to use a phrase that was used in the record here, your client is indicating that this was a sham deal. But prior to all of this happening with regards to COVID and everything else, they had paid their rent for 18 months prior to their starting the default. And so if it's a sham deal, why would they even be paying 18 months prior to this crisis that occurred that affected everybody in the real estate industry? So the thing that's a sham, Your Honor, is the fact that they're here on appeal blaming COVID for the demise of this location because that is directly contradicted by the evidence in the record. What the evidence shows is that COVID was used as pretext. We know from a lot, and you probably have seen a lot of cases where people took the pandemic as an opportunity to do wrong or to take bad acts. And this is one of those cases where they used COVID as pretext for the real motivation to shut this business down. Because if you look at the record, Your Honor, at C-1732, there's a presentation from the CEO of Industrious where he says the Jackson location was not closed because of the business impact of COVID. The record below says one thing, which is COVID had nothing to do with our decision to close this location. And the appellate argument you're hearing is this was just a hard-won business deal because COVID was hard on real estate. That is not what their CEO told the entire company contemporaneously in the middle of the pandemic. Were you familiar with Project Blue? Yes. Was Project Blue illegal? I believe Project Blue was the plan that they architected to use COVID as the pretext to close 10 to 12 locations around the country. And they used that. They said, hey, we have an opportunity now because landlords are in a weakened state. We're in the middle of a pandemic. We can get away with closing some locations. Their words were these were bad business deals to begin with. And they said COVID exposed a weakness that preexisted COVID. Correct. Correct. And so they used Project Blue to effectuate a business act, right, which I believe took their special purpose entities and used them for wrongful purposes for which they should not now be accorded the protection that Illinois law and Michigan law provide for limited liability corporations. Okay. Thank you very much. And what relief are you seeking? I'm seeking an affirmance of Judge Roberts' decision. Okay. Thank you very much, Robert.  If you don't mind, let's start right at the top where counsel began by a really powerful concession on the fraudulent transfer. It's subservient. You don't even need to reach it. It's really a weak claim. This is a sandcastle. And the base of that sandcastle that Pai could wash away is the fraudulent transfer because it actually is the tail wagging dog, to mix my metaphors, the alter ego claim. That's the core of the alter ego claim, this notion that we fraudulently transfer members. And now we're saying don't look at fraudulent transfer. It's subservient. It doesn't really matter. But it's all circular. If the members were terminated, agreements were terminated, they're not assets, it's not money, it's not a sofa. You can just move across the street. And there's no fraudulent transfer because it wasn't an asset. And because they were terminated, there was nothing transferred. Both the noun asset and the verb transfer work against them. But once that claim goes away, there's no alter ego claim because there's no fraud to speak of here. Because whether you dress up in costumes on Halloween or you don't tell the landlord precisely when you're going to close, does not, post breach activity does not give rise to a veil piercing claim. And so that concession is really powerful to sort of erode the sandcastle of an argument. Now, I do want to talk about, because there was some time spent on who are we signing this lease with? And should we hold you to the deal that you signed? Because we both have LLCs. And not to belabor the point, but counsel points out, well, there was this, the first time we heard about it was when the entity was put into the lease. If you thought, this is why it's not credible, if you thought it was industrious national, let's call it, why would there be a bracket for the tenant? Everyone knows what the company's name is. Why would there be a bracket? You filled in your special purpose entity, and you let us fill in ours. And your special purpose entity was created days before, and so was ours. So it's just not credible. And then we get to the members or how many signed it. This is in the record. This is not in dispute. Is that the only indication that Stockbridge may have known that they were dealing with an SPE? Oh, absolutely not. Let's go to the e-mail. They claim it's on page 10 of our brief, the e-mail that they claim we misrepresented our financials. They hadn't told by e-mail? The e-mail during the negotiations. And we presented a cash flow of all of the different LLCs rolling up, just like Stockbridge presents its consolidated financials. And, you know, a good sign when a party doesn't really kind of want to spin the evidence different ways is when they clip the evidence. And both times in their brief, they clipped that first line that our mature units are cash flow positive. Each unit was its own LLC. So why would this unit be treated any differently? And every single one of Stockbridge's investments is its own LLC. So they're treating this just the same as they always treat it, its own special purpose entity. It's just not credible. So when you ask, was that the first instance? No, even the e-mail that they claim was misleading, which was not, the financials were accurate. And it's a true statement. Our units are cash flow positive. Leading questions are not evidence. Attorney argument is not evidence. Questions are not evidence. And so that was presented below. But that e-mail, actually, is another instance of when they were told. It's actually also emblematic and illustrative when the default notice was sent. They sent it to the SPE. They didn't send it to Industrious National in New York. They sent it to the SPE. They knew exactly who they were transacting with. And to bring it full circle, yes, Assemble was organized the same way. Assemble had its own SPE. So even the tenant before us was its own SPE. This was all out in the open. How do you respond to Mr. O'Neill's argument with respect to us giving more, you know, manifest weight as our standard on review? Yes. And why should we disturb Justice Roberts' decision? Judge. Judge. Judge. I'm sorry, Judge Roberts. No. Thank you. Great question. So first. I'm elevating her. I'll be sure to let her know. There you go. The fraudulent transfer claim is actually subject to de novo review. Whether something is an asset is a question of law. Whether something was transferred, whether an act constitutes a transfer, is a question of law. And on that point, it is deafening that they don't have a single case supporting asset or transfer. Now, that's the core of their alter ego claim. And so the alter ego is more about manifest weight. But there is no weight here that is manifest. All you have is post-breach behavior, an email that even in their brief they clip. That is not manifest weight. Even the email in their brief. We actually gave you all three paragraphs. I told my team, you better copy that entire thing. I want every word in there, even the words that are bad for us. That's not manifestly weighty, that email. Dressing up as surveyors is not manifestly weight. There is nothing here that gives rise to an alter ego claim. And so if this behavior is enough to pierce the corporate veil, which is an extraordinary remedy that sets aside three different default rules, then you're going to have just a parade of breach of contract cases dressed up like piercing the corporate veil cases. And so the standard overview here actually works in our favor. Because there is simply, when you focus just on the facts from the alter ego claim, the possible transfer claim, we agree with their concession, it is not a strong claim. That's the noble review when it collapses. That's the core of their alter ego claim, which in effect is the noble review. Which you're left with a clipped email. You're left with a suggestion that a multibillion dollar company didn't know it was dealing with an SPE. No real evidence for that. And you're left with this notion that people dressed up like movers, post-breach, is enough to pierce the corporate veil. And that's just not enough. It simply isn't. Now, I've seen cases where you pierce the corporate veil when the money flows differently. And you honed in on that the money flow is only one way. Only post-termination did they extrapolate a certain amount. But if that's enough to maintain this opinion, I think we're eroding the first two L's of the LLC. Do you have any other questions? Okay. So I do want to go back to the waiver issue. Yes. On asset? Pardon me? On the asset argument? Right. Why was it not? Why wasn't it raised below? It was. So if you go to our brief, and we actually cited to it in our reply brief, and I'm just going to read their argument below. This is their argument below because we wanted to be brief here. So Stockbridge responded to, quote, our claim. Where specifically are you reading? Page two in our reply brief. Let me know when you're there. It's just the bottom of that page. All right. Stockbridge responded to, quote, the claim that upon terminating member agreements, members can no longer be considered assets of Industrious Jackson. And according to Stockbridge, even accepting the contention that Industrious Jackson's members were no longer assets upon terminating the member agreements, he transferred an interest. So we went back and forth. We didn't quote all of the briefs because we don't have space for that. So we just wanted to go to what they argued. They were responding to our argument. But you know what? We don't even need to focus on whether they were assets or not. We can just play out the facts. Upon termination, nothing was transferred. Upon termination, a contract has no value. Upon termination, you can't transfer something. So we can just focus on the verb transfer rather than the noun assets. Okay. Anything else before we conclude? No, I think that's it unless you have any other questions. I think this is up. The only other question I have is what relief are you seeking? What we're seeking is to overrule the decision that this is that Industrious, that PANCO is liable under an alter ego theory for the liabilities of its subsidiary, LLC, and to overrule the notion that upon terminating these contracts, there was a fraudulent transfer when six members decided on their own to sign up, and 87% went elsewhere. So the bottom line is what? Overrule those two counts. Okay. Thank you. Thank you. All right. Thank you both for a well-argued matter and an interesting case. We will take it under advisement, and as I indicated before, Justice Flankin will be listening to the tapes, and then we will all together collectively will render a decision. Okay. Thank you.